Thank you, Judge Nelson. Good afternoon, Your Honors, and may it please the Court. Jacob Ecker, on behalf of the U.S. Forest Service, I'd like to reserve four minutes for rebuttal. This is the fourth appeal involving the Hannah Flats Project on the Idaho Panhandle National Forests, a project that reduces wildfire risks and improves conditions for bears by reducing road miles on the forest. The sole issue in this appeal is simple. Does the Hannah Flats Project violate a forest plan standard that prohibits increases in road miles when the project reduces road miles? In other words, can a project be unlawful when it doesn't cause or contribute to the alleged violation? The answer is no, and the District Court erred in concluding otherwise. Look, on that point, and I'll ask your friend across the aisle about this, but is that agreed? Is there anything in the record that makes that conclusive that there is no increase in the number of roads connected to this project? So the, let me start with what the standards require, and then I'll move to the record sites that I have for that. So the standards prohibit increases in permanent road miles. So what the Forest Service looks at is whether there's been an increase in permanent road miles. So I'll start with the decision memo itself at 3ER410, which lays out a chart of all of the road impacts by the project. And it says there that it will store certain administrative roads after the project, two miles. 1.2 miles of that is within the Priest Bores, and it's been counted in the 2011 baseline. So what the Forest Service has done is said, okay, 1.2 miles of this closure is counted in the 2011 baseline. We're getting, we're closing it, and therefore we are reducing permanent road miles. Can I just back up? The baseline is the Priest Bores? So the Priest Bores is the area, the bare outside recovery zone area. And each Bores area has a baseline level that was set in 2011 based on road surveys that were done in 2010 and 2011. But Hannah Flats only affects the Priest Bores? It is partially outside of any Bores, but it is almost entirely within the Priest Bores. It's 2,300 miles of the, or sorry, 2,300 acres of the over 80,000 acre Bores area. The other sites I was going to give you, Judge Forrest, are within the complaint. There's an allegation, and this is at 5 ER 693. There's an allegation in the complaint that as a result of the project, permanent road miles will be reduced by 1.2 miles. Council also conceded this at, oral argument, at 2 ER 55 and 56. I don't think it is reasonably subject to dispute. Even if it was, I think the Forest Service's factual finding on this point would be conclusive. So there's obviously, there's arguments about the temporary roads. Right. And whether those were proper at all or whatever, but, but your point is that permanent roads is what really matters. And the record clearly establishes that at the end of this project, the miles of permanent roads is going down, not up. That's right. And the, both the purpose and the text of the Bores mileage standards place limits on permanent increases in road miles. And so what the project does is reduce road miles. Now, you alluded to the kind of disputes about the temporary road miles. We do have disagreements about what counts and what doesn't. But I don't think the court needs to get there since the top line provisions are never triggered in the first place. Otherwise, I think this, you know, the result would be inconsistent with the lands council case. One of the things that the district court said, which I think is correct, but I don't know if it's dispositive. So I want to hear your response to this is you didn't go through the proper process to reset the baseline. You would agree with that statement, correct? You didn't go through the process to actually go back and say, because I mean, you could imagine, I mean, to judge for his point, you could imagine disputes about this. How are they supposed to get resolved? Normally you would go in and say, hey, we said this was the baseline in 2011. Look, we found this stuff in 2015. We found some other stuff in 2012. We found then when the majority of this extra mileage appears to have been found. That's why I'm confused why it's not. Affected by Hannah flats because the majority of this seems to have been found while you were scoping for Hannah flats. So the. Okay, so let me start with what the 2011 baseline is supposed to represent and then what the district court said. So what the 2011 baseline is supposed to represent is all roads that were in existence at that time. The idea was to freeze existing conditions. The forest service. We're not going to make it worse. That's right. And so but what the Forest Service has discovered, and it was actually because of reinitiation of consultation based on another case out of the district of Montana, I believe. And that was in 2012 was the first 22. Yes. So the by the largest segment of numbers increase came in 2020 as a result of another case called Probert. So I'm mistaken. It had nothing to do with scoping for Hannah flat. It had nothing to do with scoping. Okay. Well, that helps answer part of my question. And so that is why we say that because it's simply not a relevant point here because we are reducing permanent road miles. So you are correct that you didn't go back and reopen the 2011 baseline and say, hey, by the way, we need to amend this based on this new information. So the district court said we should have done an amendment to the forest plan instead of what we did, which was an administrative change, which is for errors. Minor more minor things. The district court said this wasn't minor enough to constitute an administrative change. And we don't appeal that point. So right. Win or lose on this. I think we would have to deal with that if we lose. If we win, I think if you lose, you're going to have to go back and do notice and comment on the 2011 whatever that record of decision was and reopen it or go in and close enough roads that existed at that time to get below. It's actually not clear to me which would be more resource intensive because it is an extremely resource intensive process to go in and amend a forest plan. There's a lot of NEPA requirements and other requirements that are involved. But the overarching point is that because it reduces permanent road miles, it doesn't really matter whether we're at the higher number or the lower number because this project doesn't contribute to. Well, and that was my next question was, OK, so we have this whatever this violation is, how would they normally challenge that violation? Because what I'm worried about, not worried about, but it seems like what they've done is brought a violation, which may be material, maybe technical. I don't know. But they've done it in the context where lands council says it's not relevant to this record of decision. It's relevant apparently to the 2011 decision or the access amendments. So you're asking how they might get at the incorrect baseline? We don't agree with you. You're telling us that 26 miles have been newly found. That's not true. These came up. I mean, there's a whole bunch of facts here because even if they came up after 2011, I take it your position is that still doesn't matter for lands council unless it was related to Hannah Flats. Yeah. And so a good example of that is Black Ram case. The judge song was on the panel for that case added roads. And so the baseline number was was really relevant. Right. You can't add roads above a certain amount. And so in a project context like that, you could get at an incorrect baseline. And that's exactly what Black Ram was about. This court said that it was, you know, unable to determine from the record whether the Forest Service was complying with the applicable standard there, which was a more demanding standard within recovery zones. But setting that aside, the court couldn't determine whether the Forest Service was complying because it wasn't sure about what the proper baseline was. And so that's the kind of case where this could be flushed out. And it's not a case where, you know, you reduce road miles and you're doing more than just not contributing as in lands council, but you're actively working toward a solution. So, I think. In addition to lands council, our other 2 main legal basis for this are the text and the implementing regulations, which both speak to project authorizations and project specific challenges. I think to broaden out and say, well, getting at the overarching landscape level problems is not something you can do unless a project contributes to or causes those problems. The 3rd and final is just the language of the boar's mileage. Go ahead. I think that's what I was going to get at, because, you know, you raised a waiver argument here and said they didn't, if I understand it correctly, they didn't raise this in their briefs before the district court, but only an oral argument. So we'll hear about that. But can you walk through, you didn't focus on it heavily. So are you really relying on the waiver argument? Or are you mostly relying on just read the plan? And this doesn't make sense. I mean, I think we're right on the merits, but the forest service didn't get a chance to address this in its decision document because it wasn't raised before the forest service. So, you know, we do raise the waiver argument. It also wasn't raised in the district court. Why would this be raised? Well, I thought your waiver argument was it wasn't raised in the district court. I believe that I made both points in the brief and I may be mixing this up with, I made two separate waiver arguments. One was with respect to the boar standard language. My friend on the other side references this return language within it's buried within an exception for the first time on appeal. And so whether you say, okay, granted, you know, my friend on the other side did mention this at an oral argument below, not in the briefs and not before the forest service. Back up. When would they have raised this in the agency comments? Because this isn't, this is the same record of decision we've been talking about in all these appeals. It is. It's the 2018 record of decision. That's right. After the Patrick decision in 2023, the forest service rescinded its supplemental that it had done at the behest of the district court. And so we're still under the 2018 decision. There was a scoping notice. You said, hey, here's all of these, here's all this new road we found. Well, but wait, that doesn't make sense because a lot of this was found in 2020. I don't think you need to worry too. You're right. So maybe resting on administrative waiver isn't isn't the best. I'm okay with, you know, like, I think there is some level of that, given that there was, I think, or at least now there is a dispute about what the baseline number is. But the I think the on the merits of the return point, it is a subsection of an exception to one piece of the access standard that is not triggered in the first place. The top line provision says no permanent increases. And because we have a decrease here, nothing further, you know, you don't really need to read any further. And even if you do, it says return. And so, yes, it says return to the 2011 baseline that presents a bit of a quandary for the forest service when what it's touching with this project is a very small fraction of the entire boards. So, if that language were read to mean that you have to fix every existing problem that you never touched in this project, it would make it prohibitively difficult to have projects that incrementally improve conditions on the forest. And that's what the Hannah flats project does. Before you sit down, I have two procedural questions. Why didn't you press for consolidation of this case and the prior one that we also have? We had not formally consult. The cases had not been formally consolidated below, which is a puzzle to me. I think this case has been procedurally a mess for years. It's a puzzle to me as well. I agree. We support consolidation in response to the court's notice and request for our positions on that. We do support consolidation. We didn't affirmatively raise it. And perhaps we should have. Is there any decision that we would reach in the first case that would move this one? No, your honor. The court needs to reach the administrative waiver piece because it's on a separate legal claim. The H.F.R.A. and NEPA claim. This is the National Forest Management Act compliance issue. I understand that. But they both go to the decision memo. Right. As you've said, the forest service is now hanging its head on the 2018 decision memo solely. That's true. And so your position is not any decision we reach in the first case isn't going to necessarily disturb the 2018 decision memo. And therefore, this challenge still survives, because if the 2018 decision memo somehow gets displaced, then doesn't this case become moot? I mean, if it were vacated, it wasn't vacated. Right. So 2018. But the district court has not vacated it. I don't know what. Not at this point. That's right. And but if we somehow did that in the appeal, would that moot it? I would urge you not to, obviously. But I'm struggling to see how in Hannah Flats one that would be possible since the issue there is administrative waiver. Wouldn't it just be a remand back to the district court? I mean, I just it's not clear to me that there's a possibility of vacating straight. You may be right about that, but I'm just wondering if that is what I mean, in answer to Judge Forrest question, is that the only way it would be mooted out? Or I guess if you just decided to take it back and withdraw it. That's I suppose I really have to think about that. I'm not I'm just really not sure. I'll give it some thought and try to come back on rebuttal and be prepared to answer that question. Did you have one other procedural question? OK, we would urge the court to vacate the district court's opinion and allow the project to go forward. Thank you. Thank you. Welcome back. Yeah. Good afternoon, Your Honors. May it please the court. Rebecca Smith for the Appellee Alliance for the World Rockies. I'll just skip the introduction and move right into some of the conversations we're having today. Can you could you just address Judge Forrest's question about mootness first? Do you agree that number one, it's not that the first appeal is not moot now? And is there any way that it could become moot? Your Honor, if the if the decision memo is vacated in either appeal, then the other appeal would become moot. So if, for example, in the first appeal, this court found that issue exhaustion was not required, then the district court's original decision would stand setting aside and remanding finding that the categorical exclusion was unlawful. If that happens, that means there has to be a NEPA process. And so the decision memo. What what saying that the categorical exclusion was unlawful? What said that the categorical exclusion was unlawful? Because it was not within the statutory definition of wildland urban. But we said that in Patrick. We said that the wrong definition was applied. And then there was the question of, but is this challenge even presented? You know, has it been waived or forfeited or something where we can't consider it? Right. So that's what that appeal is about. But if we say that issue is not waived and we can get to it, and we've already said in Patrick that the wrong definition was applied. What is your view in terms of procedurally what happens with the decision memo? Well, then it would have to be vacated because a decision memo is only for a categorical exclusion for me, but unless the Forest Service could come up with a new categorical exclusion. But basically there would have to be a NEPA analysis and E.A. ends in a decision notice and E.I.S. ends in a record of decision. Only a categorical exclusion can be a decision memo. So there would have to be a NEPA process, which means the decision memo would have to be withdrawn or vacated. If plaintiffs prevail on that first appeal. Is that true or could or why wouldn't the district court make the decision about whether to remand without vacature or with vacature? Because I mean, I'm interested in this. Do you and it sounds like perhaps Judge Forrest think that we definitively said it was unlawful. But I thought that was in a different context. And, you know, we said, yeah, this decision wasn't made right. But we remand fairly often to say fix something without vacating. So, I mean, do we need to figure that out? Well, your honor, this is a special case because the issue is whether or not NEPA analysis is required. And so if that categorical exclusion, the use of it was unlawful, then NEPA would be required. Well, and I think there's one other procedural layer there, which is the district court, when it concluded that the categorical exclusion didn't apply, didn't vacate. It remanded without vacature and directed the supplemental decision. All right. So then the Forest Service does that. And then we have challenges about that. And now the Forest Service has voluntarily withdrawn that. So I'm sort of trying to figure out, again, you don't have a decision in that case. We haven't reached our decision in that first case. But if we were to say that that does the categorical exclusion apply, if that issue is live and we say it is and we have a problem here, what's left? But except the other procedural part of this is I don't think you cross moved for summary judgment on that issue, right? On which issue, Your Honor? On whether the wildland-urban interface was satisfied. We did in the lower court in this case, we did. You did? Yes. I was thinking that it was only the government that moved on that. No, Your Honor. I'll have to go back and check that. And the district court in its decision denied our motion for summary judgment without prejudice, I believe, because that appeal was pending. But I would like to address just three points, if I could. I want to first address we do not agree that there is no permanent road increase above the access amendment baseline. First, I want to be very clear that under Savage, it's not just whether there's any increase or decrease. It's whether there is an increase or decrease as compared to the access amendment baseline. I really want to touch on the citation that the government gave to the court, which was the complaint at ER 693. That entire section, paragraphs 140 to 144, ultimately conclude the Forest Service is violating the requirement that linear miles of total roads would be returned to or below the baseline levels contained in table 26. So that has been our argument since the complaint, that they're saying we're going to close 1.2 miles of road at the end of the project. And we're saying that doesn't matter. That's not the legally determinative fact. Yes. And this is where I think I disagree with you in your interpretation of Savage, because Savage seems like a different case. And I'd like you to tell me how this fits in. Look, you, lands council says you need to show that it was caused by Hannah Flats. So what Savage said is, yeah, you've got to show that it's caused by we don't know. We know that there's an increase in roads in Savage, but we don't know whether it's caused. So you disagree with that. That's another point. Thank you, Your Honor. None of these access amendment cases actually resulted in a net increase. So in Savage, the Forest Service had argued there would be a net reduction of 0.3 miles. That's 897 fed third at 1035. In Black Ram, there is actually going to be a net decrease of 14.7 miles. You can find that in the district court record document 62 of paragraph 36. Although there was going to be a closure of 5.3 miles, or excuse me, construction of 5.3 miles, there was also going to be closure of 20 miles. And then the third case, which is Alliance for the Wild Rockies v. Bradford, there was no net increase. In fact, the Forest Service explicitly argued no net permanent increase. That's at 35 fed sub third at 1254. So in every one of these cases, the Forest Service was making the same argument that it is today. It's saying, yes, we're building new roads as part of the project, but then we're going to close them. And in every one of those cases, this court has addressed the access amendment. But that's different because all of those roads had to do with the project itself. That's what's different. I mean, that's why I do you think that these 23.6 miles that they discovered, you know, over, I guess, three different periods of time, are any of them related to the Hannah Flats project? Yes, your honor. So, first of all, an issue that we have sort of skipped over is that there will be a permanent opening for motorized use on the ski trails in this project area. That is actually a permanent increase in open roads from this project decision during this project. And you can find that in the scoping notice for this project at SCR 316, where it says that the Hannah Flats project authorized the removal of barriers in the roads and authorizes cutting down trees to expand the road from 10 feet wide to 20 feet wide. And the reason to do that is so that a snowmobile can drive down those roads. And how many miles is that? 7.2 miles of ski trails, your honor. And those are also receiving illegal motorized use. That's at SCR 138 to 139. I just want to be clear, though. Thank you for this. This is very helpful. Are those 7.2 miles of ski trail within the 26 miles that they have added, or excuse me, the 23.6 miles that they have added to the baseline? In the administrative change, is that what you're asking about? What I'm asking is, so the reason that the district court said that this violated the forest plan was because, look, you had 316 miles in your 2011 baseline. Post-project, you now have 338. That is, as I think it's 23.6 miles. I'm not sure that all the math adds up because I think we're missing. Anyway, basically, the Forest Service is saying 20, you can't consider those 23.6 miles of increase because those were just, those were already out there in 2011. They should have been in the baseline. So my question to you is, these 7.2 miles of ski trail that you're talking about, are those within that 23.6 miles or it's a separate bucket of miles? It's separate, your honor, because those are illegal roads. So this also brings up another issue, which is that those 7.2 miles allowing motorized use on those ski trails. But where did the, did I miss this? Did the district court address this below? The district court asked us for supplemental briefing on this issue. And so there was supplemental briefing filed in the district court. He never made a decision about whether those 7.2 miles were a violation. Yes, your honor, and that's document 65. And the reason that the district court didn't address it is because the ski trails are illegal motorized use and the district court never reached the issue of illegal motorized use. So I misunderstood the answer to my question. My question was, the district court did not find that this was a violation and you're agreeing with me that it did not find that. No, your honor, I don't agree. The district court did not reach the issue. That was my question. The district court did not reach it. He did not find it was, he didn't say it's not a violation. He didn't say it is violation. Is this one of your three alternative arguments? Yes, your honor. This is related to the temporary and illegal road use. And so, you know, that's another issue here is the district court really just address the first and if my argument. But it sounds like we would if that's why I want to focus on the 23.6 because that seems to be what the district court's decision was if he's right. We affirm him there in violation. We go from there. If the district court's wrong on that because of an interpretation of lands counselor Savage, then it sounds like we need to remand so that these other arguments can be raised. Your honor, I, I want to make sure that we do have all the information on the record about what exactly this project is doing because when you sort of sort of tug on one of the arguments, it does pull on the others because that 1.2 miles they keep saying just they say is going to be a net decrease that completely depends on all of the road closures being effective. Well, that's a whole separate argument. You've said they're not gated and therefore they're not closure. And so if the 1.2 miles isn't gated, then that wouldn't be a decrease. And so, and so they can't really make this argument that they have a 1.2 mile decrease without addressing the lines for the wild Rockies be Bradford which requires effective closures because there are 30.4 miles of illegal motorized use every single one of those roads would have to have an effective closure in order to then have a 1.2 mile reduction. The district court didn't decide any of that. I mean, I'm really hesitant to get in here and decide whether a gate on appeal if we rule against you on the first issue and say, look, this and I don't know what, where we're going to go with that. I'm very hesitant to take one of your alternative arguments and say, oh, yeah, but there's no gates here. I mean, that just seems like something we would remand to the district court. I mean, what do you think you think we have enough information. We could just alternatively ruling your favor. Yes, your honor and the record is established and these are questions of law and there really is no dispute on the temporary road issue. This project is not going to return the priest fours to the table 16 baseline, that is the plain unambiguous language of the forest land standard. And this project violates it. I mean, I understand the argument, but from a practical standpoint. What you're saying is that if you have a situation where the forest service makes a mistake in its initial survey of how many roads are in a particular area that no projects are going to happen in that area until that mistake otherwise gets fixed. And that doesn't make logical sense to me. No, your honor. That's not what we're saying that the forest plan standard mandates upon completion of a land management project linear miles of total roads would be returned to or below the baseline levels contained in table 16. The job of this court is to look at that plain language and decide if that's violated and it is whether or not this is a good standard seems to be the question you're really raising that is for the forest service to analyze when it when it conducted an exhaustive NEPA public process and pass the access amendment. This was the language. Yes, your honor. This was the language for his point is they did. They thought they had it in 2011. Then they find new roads. What did you want them to do if they find 20, 20 miles of new roads, they can't do a new project unless they take out 20 miles of road. That's incorrect. Your honor. They could just issue a forest land amendment and the forest service does that all the time. They issue project decisions with a site specific force plan amendment. It takes no additional time, but it's notice in common. That process is already happening and it's 10 more pages in that document to just follow the law and do an administrative force plan amendment. It's not a big ask and it is what the law requires and your honor. Just one final thing. Why does the law require that and we'll give you time because I know you want to cover this, but why does the law require that because the lands council, you know, I know there's a miss. I know there's a difference of interpretation of savage, but lands council clearly says if it's not caused by Hannah flat or you know by by the project, you can't consider it. You're not arguing. That's why I'm pushing you. You're not arguing that any of these 23.6 miles are caused by Hannah flats, right? No, your honor. That is not what lands council says. First, let's take the first issue. I want to be clear about what we're talking about. Are you suggesting or have you made the argument that any of the 23.6 miles are caused by the Hannah flats project? No, your honor. They were authorized during this project though. And that's a whole nother thing that that authorization was a two page memo written to the Hannah flats project record. When you say authorized by this project. Exactly what do you mean that the, they weren't creating them in this project? They went from these are illegal roads to now these roads are lawful. We authorize including them in the baseline. Yes. Okay. But the district court said they didn't properly amend the baseline and they didn't appeal that decision. Correct. Right? So then the only question is. Under our existing precedent. When a project does not cause the creation of essentially roads beyond the baseline. Are they obligated in the project? Your argument is under the temporary road closure subpart. Whatever that the forest service has an obligation then to. Eliminate that newly found roads that should have been in the baseline, but and back so that everything is to the baseline, even if the project is not the cause. Of that overage correct. Yes, your honor, because that's what the forest land standard requires and we look at your argument about this. I just want it. And then they're arguing reading context. It doesn't mean that. So there's a dispute about that, but I'm just saying your position is reliant on the interpretation of the standard. Not. You're not arguing that the project actually caused that overage. No, your honor, and our distinguishing is that in lands council, you had an old growth forest logging standard that said, and they said, we can't bring the forest back to 10% older because we can't create old growth. And we're saying here, our standard is fundamentally different because you can just create closed roads. You can just issue a closure. You can absolutely bring it back to the pre spores at the completion of every project. But as long as no court is willing to enforce this provision, they're just not going to do that. And the roads are just going to keep increasing and increasing the roads are only going to increase. I mean, they still have to show that these were in the baseline in 2011. No, your honor. Yeah, they do. I mean, because if they're not in the baseline of 2011, I mean, I guess I think they've still put themselves to a higher burden here by not amending the forest service project, because the only difference. As I see it, potentially, I mean, I admittedly, this is a tough record to dig through. The difference between this case and Savage is that in this case, they can show perhaps that these roads pre existed in 2011 and should have been in the baseline and it wasn't clear in Savage. I mean, it's not exactly analogous, but it wasn't clear. It was murky. So we remanded it to figure that out. That's what I'm trying to figure out. But I take it from your answer to judge song and me that you're not saying your only argument is based on the forest service plan. It's not based on we think that they're lying or they're not right about these 23.6. You agree that they were pre existing in 2000. There's nothing in the record to say that because there was no NEPA process for a forest plan amendment. And so, you know, what happened was they looked at Savage and they thought, we have to put these roads in the baseline. And so they issued a document that said, we're now putting these roads back into the baseline. And we said, you can only do that if it's a forest plan amendment. We don't know anything about those roads because there's never been a NEPA process because there's never been a forest plan amendment. But tell you whether those roads existed prior to 2011. Because it would require public notice, comment, analysis, FOIA requests, mapping. We don't have any documentation of what those roads, where they are, when they were issued, how long they've been used. For all we know. Related to Hannah flats. Your Honor, for all we know, they could have been implemented in the last five years. Like in 2011, when the access amendment passed, that was 15 years ago. Some of those motorized trails could have been built since then. And we don't know. I sort of agree with you. That's why I was pushing him to say, you should have an avenue to challenge this. But that seems like two separate arguments. One argument is, do you have the baseline correct? And the other argument is, what's Hannah flats doing and causing? Well, Your Honor, two points on that. The first is that this did become a ripe issue here when the Forest Service issued a two page administrative change in the project record for this case. Can you give me the citation for that? You mentioned it before. If you need some time. I mean, we can get it later from you. I have it right here. It is S. E. R. 134. So, you know, they did try to do this as part of this project record and they did it unlawfully, but they could do it again lawfully. But that's why it's part of this project record, because S. E. R. 134 is a document that was created as part of this project record for this project. And then the other thing, there was just a sentence about some distinguishing between the pre sports and the project area. And I just wanted to note that the closure of those 30.4 miles of illegal roads, some are in the project area and some are not all throughout the pre sports. The Forest Service has said that that entire action, closing all 30.4 miles of roads throughout the entire pre sports is part of this project. So, it's not like only the roads that are part of the project area are part of the project. They're saying the entire pre sports is the project analysis area and the closure of all 30.4 miles of roads is part of this project. And you can see that at S. E. R. 123, where they're saying, basically, the entire pre sports road closures are part of this Hannah flats project. And so there is no distinguishing in the record between things in the project area and the rest of the pre sports. It is all the Hannah flats project. And that's because they chose the pre sports as the analysis area for the effects. And that's at S. E. R. 255. they said, I'm a little bit confused by this argument because I didn't understand when the Forest Service is looking at the baseline and the effect of the baseline. I didn't understand them to be saying. We're reducing because we're closing various roads throughout the pre sports. We're now determining that this project will reduce the baseline. I understood them. You saying, because of this small section of road 1.2 miles that is in the baseline is going to be closed. We're net reducing the baseline and then there's all these essentially illegal roads that were never included in the 20,000. 2011 baseline, some of which are going to temporarily use and then shut down some of which, I guess, are going to just continue to be illegal roads that maybe should have been in the baseline. I don't know. I think we just don't know. Right? I think we don't know where they pre existing 2011. did someone go out illegally create them in 2015. it seems to me a little bit unclear, except for the fact that everyone agrees. There's some number of illegal roads that were missed essentially in the 2011 survey, but that are not being created by the, I mean, the proposal that we're dealing with now is not the cause of that, except when they at 579, they are converting 8.4 miles of illegal roads into log hauling roads for this project. Right? And then they say that they're so essentially, they seem to be saying, we're taking advantage of the fact that there are these illegal roads. We're going to use them and then we're going to shut them. Right? That's what I just read that site. That's what they're representing. We're going to use them and then we're going to shut them. So then. In theory, because they're shutting them, they're within the. They're not creating permanent new roads that exceed the baseline. Yes. And that would completely depend on whether there is an effective barrier on all of those roads that they rebuild and uses logging roads, which is why we're saying that before the project is over. Well, your honor, in the other cases, like the black ram case, what we looked at was the track record and we looked at, you know, in this case, 11 out of 12 years, they violated the road density standards and the pre spores. They said they closed the roads in 2020, but then between 2020 to 2023, they found 31 instances of roads still being violated in in our complaint. We listed 28 examples of roads being violated is the issue. The district court didn't reach. Right? So, and I assume then there's some dispute of. Dispute about whether the road closure methods that the forest service is proposing to use are effective or not. And so you would say, because. Past history shows these particular methods aren't effective. You don't actually, you're not you say you're closing them, but you're not actually closing them. I assume that. I haven't dug into this because it just didn't reach it, but I assume that's what you're arguing. And the forest service is either. Saying we disagree, we think they are effective as a matter of fact, or we're using some new method that is more effective than these. Other ones, or some combination there is that am I getting the issue? Correct? Well, they're not actually arguing that they're being effectively close there in the record. What they did was just cut down a tree and put it in front of the roads, and then the tree is removed. So there's really no argument that those are effective barriers under the access amendment. And this gets to align for the wild Rockies, the Bradford, which said there has to be an effective barrier. I just don't know how we're going to. Get into deciding that issue, I mean, the best case scenario, it seems for you would be a remand to have the district court. Look at that. I mean. We don't know, I mean, we don't know which ones of these had, you know, trees put there. We don't know if those trees have been removed. We don't know which ones had barriers, which ones weren't locked. I mean, that seems like there's a whole bunch of things that could go wrong and you may be right, but. I don't know, I just I can't see us jumping into it, but your honor, I'm way over time, but could I just make 2 final points here? 1 is that because that's that section of the access amendment about temporary roads is so clear and says that it must be returned to that baseline after the completion of project. This court could just look at that temporary road provision alone and and find that the case violates the access amendment and and then the 2nd issue on the permanent roads. You know what? We're really sort of focusing on here with that is that memo. That was the administrative change. 2 pager. Yeah, that that was part of the planning for this project. It's in this project record. It's not in any other project record and so this is your only chance to challenge it. Yes, the action of them authorizing those roads was in that 2 page memo and this is our only chance to challenge that. And it was unlawful and it violated the access amendment to do that. Thank you very much. We'll give you more than 18 seconds for rebuttal. So, I'll start briefly with, um, just for us, your procedural question when I was up here before, um, I, I'm just not prepared to concede a mootness point today. I think if there was any consideration of bigger in the other case, I would ask for supplemental briefing to deal with that. Um, why would we do that? Because we've already argued and. You know, we heard from the parties on the positions of that case, and then we asked her about consolidation and. I mean, we agree that I agree that you sort of half heartedly. No, we fully support consolidated opinion. I mean, we didn't ask for it. We did not affirmatively ask for it. We support a consolidated opinion in both of those cases. Just like in Patrick, it would resolve all the issues. I think it's a separate legal issue. So we, you know, the forest services, um, you know, hoping for guidance on this. And so I'm just, I'm, it would, I think, be too much for me to say today, whether a vacater would would moot out that separate legal question. I'm just not sure the answer. Um, I, I don't think vacater is appropriate for all the reasons that are probably in the briefing in the other case. And for even if you lose. Well, that's right. That's correct that you are going to prevail. And maybe you will on the, uh, on the, um, categorical exceptions to the forest service, and then you're going to have to decide whether or not you're going to vacate the district court, because you would typically remanded the district court to decide the remedy and the district court before did not vacate. It's simply remanded because if it's a minor fix, if it's something that doesn't remanded with directions for the forest service to do something more, the forest did something for service did something more. And then it voluntarily retracted that and I think you wanted to stand on the 2018 decision memo. That's correct that you are going to prevail. And maybe you will on the, uh, on the, um, categorical exception issue, not being here, right? I mean, isn't that part of it? Well, I believe my colleague, uh, Joan Peppin addresses at the last argument, which is there's actually other reasons for the justification beyond what this court addressed in Patrick. It's not an open and shut thing. I mean, the, the, I wanted to ask about that. What are the other reasons? I'm interested in that. What are the other reasons? Well, I, I'm sorry. I'm not right. Because we're not because we haven't consolidated these cases. And we're only arguing half of the issues. That's not this case. And I, you know, so you're saying, go see my colleagues. I watched, I watched the argument a couple of days ago. I thought it was very persuasive. So in short, it is not that the Forest Service relied exclusively on that, that state or local government. We said that in Parrick, we may have a disagreement. We got to flesh out here, but you don't remember exactly. You're not prepared to address that. I'm not. And I, with permission, knowing I'm over time, I'd like to address some of the issues in this case. That's all right. So I think we heard that the issues concerning temporary roads, the issues concerning these ski trails issues all turn on the interpretation of the return language in this exception. So I don't think the court needs to get there if it agrees with our interpretation of the access standards. I mean, but that's the it seems like that's the elephant in the room is that's their best hook. And we just have to decide which way that you would agree that if we agree with their interpretation, we then we got the ballgame for purposes of this appeal. That provision says upon completion of a land management project. So as Judge Sung said, our position is in context. What it means is you you put back the things you moved, right? You don't have to fix everything in existence at the time of the project. I mean, I mean, I could be wrong. I'm assuming at the time that this language was passed, the forest service didn't know it was going to discover miles and miles of roads that should have been in the baseline, but we're not. That's correct. And it also gone. It had discovered because that was 2000 and 8. Oh, no, this is the access. Got it. Got it. You're right. The 4 0, 4 that says temporary increases not offset and linear miles of total roads are acceptable in their following conditions. 1. A. B. C. C is that upon completion of a land management project, linear miles of total worlds will be returned to you or below the baseline levels. And the question is reading context are they saying if. If after the baseline was set, we realize that there's, we find more roads. Whether they pre existed the baseline, or someone came in after the baseline and created illegal roads. I don't know, but we found a whole bunch of roads. We didn't include in the baseline whether C means. Now that you found them the next time you do project. You have to fix that all or whether C means. The next time you do a project, you just can't do more damage. So, right? You have to, you have to go. That's right. You have to ensure you go back to the baseline and it talks about table 16 and what the forest service thought it was doing was capturing all roads in existence. And so you're exactly right. The fact that it later discovered more roads means that. It does not mean that upon completion of a project, you have to then go and fix all of those newly discovered problems. I mean, I think the other kind of lurking issue is that when this language is promulgating this, this court had not decided savage yet, which said, you have to compare to the 2011 baseline as promulgated. You can't go out and do new surveys and continually update that based on factual determinations that you think this did exist in 2011. And so this language referring to table 16 and referring to baseline levels, I don't, you know, the forest service just didn't mean to freeze for all time that baseline. Now, that's where we are today. And it made that comparison. You can just amend this very easily. So my friend on the other side also talked about my friend. They also my friend on the other side also talked about all the things that go into that. I mean, there's there's additional NEPA work. There's additional notice and comment. I mean, this is not as simple as as adding 10 pages. I mean, if I understand correctly, the forest service tried to amend and disregards that it was improper. That's right. And we don't appeal. And so I don't think that's it at issue. And if we lose on our threshold lands council point, we lose this appeal. And we have not, you know, if we win, we've asked for vacater because that threshold dictates that the follow on point can't be reached. When you ask for vacater. If we win on the threshold lands council issue, the district court couldn't have reached a baseline question because that's right. Vacating the district. Not your district. I would not ask for vacating the district. There's been a lot of twists and turns here, but I guess one other question is what does the forest think it should do if anything about illegal roads that aren't in the baseline? So, I mean, that seems to be practically speaking, part of the problem.  The point is well taken. The Forest Service takes this stuff seriously. It does go out and do patrols. You know, a lot of that's not in the record on appeal because that wasn't reached below. And but the Forest Service does patrols. It fixes things when it finds the problems. It has limited resources, but it does what it can. And it also, you know, depending on the outcome of this appeal in part and, you know, depending on its efforts, which are ongoing to close additional roads in the project area, it may be able to get back to that 2011 baseline without doing it, doing an amendment if it can close enough roads. And that gets to one other point that I wanted to address, which is the other cases that my friend on the other side talked about. Black Graham, Savage and Bradford. The problem was not their, you know, she said that the there's a net reduction and that was the position. But the net reduction only works if the baseline is sufficiently within range that the reduction is enough. So the issue here. So I'm getting a little twisted here. So there were additions of permanent roads and subtractions of permanent roads in those other cases. And the question was, were the subtractions enough to get you back to where you need it to be? And so the question of unauthorized use comes into play because you say, did you correctly calculate that here? All we have is subtractions of permanent roads and we have some temporary roads and I just want to be clear. Because maybe there is a little bit fuzziness on the. 1.2 actually being from a baseline road. If that's at all debatable, does it matter if it's. Totally agreed that the project is not actually. Adding any permanent roads, like, does it do you have to prove that you're mitigating the problem to not violate the council? You can do nothing. Okay. But I don't think, you know, the forest service and we cite the, the, the, the, the sites in our brief and I'm sorry, I don't have them handy, but the forest service checked against the 2011 baseline. The 1.2 miles are part of a route called 1395, which is a system road system. Roads are included in the 2011 baseline. The things that were excluded were like, certain types of motorized trails and the sites. I have in the brief that if I had that 1.2, you think is totally clear from the sites in the brief that that. Is a closure of baseline roads. And that's the only thing you're claiming is a closure of baseline roads. That's actually a reduction of the baseline, but I think you would concede if we count for the, the road roads, it's not actually. Overall picture is not better than the baseline. I'm not sure because I don't think that it's been fully. I mean, I don't think hundreds of miles of unauthorized uncharted roads. You would say, if that were true, maybe, but the project is closing a certain number. So, with the 4th service would need to go in and do the math. I actually don't know the answer or whatever. Right? And so we're, we're closing and closing. They say, in effectively closing, you say effective, it doesn't matter. You're saying you're, we're closing. So, maybe we are even accounting for the road roads, making things better. Okay, that's right. So we would, and I'm to be very clear. I'm not sure the answer to the question. I don't think it's presented in this appeal. Okay. So, if there are no further questions, we would urge reversal and of the district court. Thank you. Thank you to both council for another well, our appeal that helps us in a fairly complicated and nuanced case. The case is now submitted and that concludes our arguments for the day. Thank you. All right. Hear me hear me all persons having had business with the honorable United States Court of Appeals for the 9th circuit will now depart for this court for this session now stands. I know it was like a DC circuit.
judges: NELSON, FORREST, SUNG